**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JACLYN R. JURACH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-044 |
| | § | |
| SAFETY VISION, LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Jaclyn Jurach sued her former employer, Safety Vision, LLC, in state court. Jurach claimed that she was disabled, that Safety Vision failed to accommodate her disability, and that it fired her for discriminatory and retaliatory reasons. (Docket Entry No. 1, Ex. 2; Docket Entry No. 7, Ex. 4). Safety Vision timely removed, and after discovery, moved for summary judgment. (Docket Entry Nos. 1, 15). Jurach responded, and Safety Vision replied. (Docket Entry Nos. 19, 28). Based on the pleadings; the motion, response, and reply; and the applicable law, the court grants the motion for summary judgment and enters final judgment by separate order. The reasons are explained below.

**I.     Background**

Jaclyn Jurach worked at Safety Vision from January 2006 to October 14, 2010. She was hired as the Trade Show Coordinator and Service and Warranty Manager. (Docket Entry No. 20, Ex. A, Jurach Affidavit at ¶¶ 2–3). In May 2007, her job functions were split into two positions, and

she became the Trade Show Coordinator.  (*Id.* at ¶ 5).  Jurach is disabled[1] due to a detached retina,

eye surgery, and a condition called Mydriasis.  (*Id.* at ¶¶ 8–11, 19).  Since at least January 2006,

Jurach's condition has caused her to have headaches when working in fluorescent light.  (*Id.*).

Jurach alleges that her eye problems are best accommodated by working in a room with natural light,

working with no fluorescent lights and lamp illumination only, or working in an area where she can

face a wall and turn off the fluorescent lights in front of her and above her head.  (*Id.* at ¶12).

When she first started working at Safety Vision, Jurach worked in a cubicle with fluorescent

lights overhead.  (*Id.* at ¶¶ 12–13).  She complained to Safety Vision about her work environment,

telling the company that her small computer monitor caused her pain because of her disability.

(Docket Entry No. 15, Ex. A, Jurach Depo. at 143).  Safety Vision gave Jurach a larger monitor.

(*Id.* at 140–41).  Jurach complained more about her eye problems.  (Jurach Affidavit at ¶ 13).  After

an extended personal absence from July to November 2006,  Jurach returned to work at Safety

Vision and was assigned a cubicle next to a window that gave her natural light.  (Jurach Depo. at

137–38).  Jurach also turned her desk to face toward a wall, away from fluorescent lights so that they

were not in front of her or above her.  (*Id.*).

Despite the reduced fluorescent light and the natural light, Jurach complained, stating that

the fluorescent lights behind her cubicle aggravated her disability.  (Jurach Affidavit at ¶ 13).  In

late 2007, Jurach asked to be moved to a large interior office on another floor.  Safety Vision agreed

to let Jurach work in the large interior office she had identified, along with another employee.  (*Id.*

at ¶ 14).  The other employee allowed Jurach to take out some of the fluorescent lights but not to

---

[1] For the purposes of its motion for summary judgment, Safety Vision does not contest that Jurach is disabled.  (Docket Entry No. 15 at 15).

turn off the lights entirely.  (*Id.*).  Jurach alleged that "[t]his actually turned out to be worse for [her] eyes and [her] headaches grew more painful and more frequent."  (*Id.*).  Jurach complained again, and asked for another office move.  (*Id.*).

In September 2008, Safety Vision agreed to Jurach's requests to move to a private office where she could "turn all the lights out" and "disengage many of the [fluorescent] rods above."  (*Id.* at ¶ 15).  Jurach claims that this was "the best work space she had had" at Safety Vision "because she could turn off the overhead lights and work by lamplight."  (Docket Entry No. 19 at 5).  But even in the private office, Jurach complained that she suffered from severe migraine headaches. (Jurach Affidavit at ¶ 15).  Jurach told Safety Vision that she needed to be moved again, back to an office with natural light, to accommodate her eye problems.  (*Id.* at ¶¶ 16–17).  Jurach had been assigned such an office from November 2006 to late 2007, until she requested and was moved to a larger interior office on another floor.

Jurach asked multiple supervisors, the Director of Human Resources, the Chief Operations Officer, and a Human Resources coordinator to allow her to move to an office with a window.  (*Id.*).  She alleges that an office with natural light was available in November 2009 but was given to a "young new engineering employee" instead of to her.  (*Id.* at ¶ 17).  Jurach asked Chris Fritz, who was in charge of that area of the building, to let her know if another office with natural light became available.  (*Id.*).

In February 2010, Jurach had surgery for a detached retina.  The surgery left one eye permanently dilated, and Jurach's sensitivity to fluorescent lighting increased.  (*Id.* at ¶ 18).  In March 2010, Jurach again asked Fritz for an office with natural light.  (*Id.* at ¶ 22).  Fritz told Jurach

to talk to Lawrence Rominger, the Operations Manager. Jurach emailed Rominger, but did not receive a reply. (*Id.*).

In April 2010, Safety Vision fired an employee who had a window office near Jurach. (*Id.* at ¶ 23). Jurach asked Tara Pesek, a Human Resources coordinator, to move her to that office. (*Id.*). Pesek told Jurach to contact Rominger. Rominger did not give Jurach that window office, but said he would "pay attention to [her] situation" when the offices were reorganized "sometime in the future." (*Id.*). Jurach emphasized that she wanted a private office. (*Id.*).

In September 2010, in the reorganization, Jurach's group was moved to cubicles on the top floor of Safety Vision's two-story building. (*Id.* at ¶ 27). Jurach complained to multiple supervisors and to Bruce Smith, the President and CEO of Safety Vision. (*Id.* at ¶¶ 29–30). She found that the new space was worse than the offices she had worked in before. She complained that the fluorescent lights gave her headaches, that it was too hot, and that a coworker in her new office area distracted her. (*Id.* at ¶¶ 30–31). Jurach told Safety Vision that she wanted to have a private office with a door she could close. (*Id.*). Jurach asked that the second floor's marketing library, which she described as "being used to hold old magazines and a shredding bin," be converted to a private office and given to her. (*Id.* at ¶ 32). Safety Vision did not accept this proposal.

Jurach's manager, Chalon Dilber, talked to Michael Ondruch, Safety Vision's CFO, who then met with Jurach and heard her complaints. (*Id.* at ¶ 35). Ondruch asked Jurach to get a note from her doctor describing her eye conditions and the appropriate accommodations. (*Id.* at ¶ 29). On September 27, 2010, Jurach gave Ondruch a letter from her doctor, and Ondruch told her that he would consider her request. (*Id.* at ¶ 35). The letter stated that Jurach had "severe light sensitivity to her eyes." (Docket Entry No. 20, Ex. A-8). Ondruch called Jurach's doctor, whose

assistant reportedly told him that Jurach could be accommodated with "dimmer lights," "tinted glasses," and "fewer hours working on computer monitors." (Docket Entry No. 15, Ex. B, Ondruch Depo. at 146). In another letter, which Ondruch testified that he did not receive, Jurach's doctor told Safety Vision that "[i]f you can possibly accommodate her to a less lighted area, it would be very beneficial to her." (Docket Entry No. 20, Ex. A-10).

As as interim measure, Dilber offered Jurach the use of a downstairs conference room. Although meetings were sometimes held there, they were infrequent. (Jurach Affidavit at ¶ 39). Jurach declined, saying that she would prefer to work from home "Monday and Friday afternoons and all day Wednesday." (Jurach Depo. at 265–66). Safety Vision agreed to this arrangement, and Dilber told Jurach that he would try to find another office for her. (Jurach Affidavit at ¶ 39). On October 7, 2010, Jurach again asked Dilber to convert the marketing library into a private office for her, because the heat and bright lights made work at her cubicle difficult. (Docket Entry No. 20, Ex. A-12).

In 2010, Safety Vision's revenue decreased. Its management decided to lay off staff and reduce salaries. (Ondruch Depo. at 45–49). Safety Vision implemented a three-stage reduction in force. (*Id.* at 211–12). In total, Safety Vision reduced its work force by 25 percent, firing 24 employees whose annual salaries totaled $1,275,831. (*Id.* at 60; Docket Entry No. 15, Ex. C). Jurach was laid off during the third and final stage of the reduction in force, on October 14, 2010. (Jurach Depo. at 15). Melissa Foteh, another marketing employee who was not disabled and was paid less than Jurach, took over Jurach's duties. (Docket Entry No. 15 at 12).

Jurach sued Safety Vision in federal court in September 2012 under the Americans with Disabilities Act of 1990 ("ADA"). She dismissed her case without prejudice shortly after filing it,

and filed a new suit in state court on September 13, 2012, asserting claims under the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE § 21.001 *et seq*., and for intentional infliction of emotional distress. (Docket Entry No. 1, Ex. 2). She amended that petition in September 2013, again asserting only state-law claims. (Docket Entry No. 7, Ex. 3). In January 2014, Jurach asserted ERISA claims in her response to Safety Vision's summary judgment motion. (Docket Entry No. 1). Safety Vision timely removed based on ERISA preemption and, after discovery, moved for summary judgment on all of Jurach's claims. (Docket Entry Nos. 1, 15).

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's

response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a motion for summary judgment, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Analysis

### A.    The TCHRA Claim of Failure to Accommodate

TCHRA claims are barred if the plaintiff does not file a charge with the appropriate governmental agency within 180 days of the alleged violation. TEX. LAB. CODE § 21.202. Jurach filed a charge with the EEOC and the Texas Workforce Commission on April 11, 2011. (Docket Entry No. 15, Ex. F). Safety Vision argues that Jurach's claim is time-barred because she made her last request for accommodation on October 7, 2010, 186 days before she filed her charge. Jurach responds that the failure to accommodate her disability was a continuing violation that lasted until her job termination on October 14, 2010, 179 days before she filed her charge.

"Under the continuing violation doctrine, a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period if the plaintiff can show a

series of related acts, one or more of which falls within the limitations period." *Henson v. Bell Helicopter Textron, Inc.*, 128 Fed. App'x 387, 391 (5th Cir. 2005) (citing *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)). A continuing violation "involves repeated conduct," and "cannot be said to occur on any particular day." It instead "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). When the employer's conduct consists of a series of "discrete discriminatory acts," the fact that one or more falls within the actionable time period does not save related claims that would otherwise be time-barred. *Id.*

The continuing violation doctrine does not apply when "the relevant discriminatory actions alleged in the complaint '[are] the sort[s] of discrete and salient event[s] that should put an employee on notice that a cause of action has accrued.'" *Windhauser v. Bd. of Supervisors for Louisiana State Univ. & Agr. & Mech. Coll.*, 360 F. App'x 562, 566 (5th Cir. 2010) (quoting *Huckabay v. Moore*, 142 F.3d 233, 240 (5th Cir. 1998)) (alteration in original).

Safety Vision agues that the Fifth Circuit decided in *Henson* that the continuing violation doctrine does not apply to failure-to-accommodate claims. *See Henson*, 128 Fed. App'x at 391. (Docket Entry No. 28 at 2). In *Henson*, the alleged failure to accommodate consisted of denying the plaintiff's specific requests for time off or scheduling changes. *Id.* The Fifth Circuit held that because each denial of a request for time off or a different shift was a discrete act, the plaintiff did not show a continuing ADA violation. *Id.* Other circuits have similarly refused to apply the continuing violation doctrine to discrete denials of a plaintiff's accommodation requests. *See*, *e.g.*, *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 135 (2d Cir. 2003) ("Once the employer has rejected the proposed accommodation, no periodic implementation of that decision occurs."); *Aubrey*

8

*v. City of Bethlehem, Fire Dep't*, 466 F. App'x 88, 93 (3d Cir. 2012) ("The nature of [the plaintiff's] claims do not involve repeated conduct."); *Proctor v. United Parcel Service*, 502 F.3d 1200, 1210 (10th Cir. 2007) (explaining that employer's denial of requested accommodation "constitutes a discrete act of alleged discrimination"). These courts have not held, however, that the continuing violation doctrine could never apply to failure-to-accommodate claims.

This case is distinguishable from those in which courts have found denials of accommodation requests to be discrete events rather than continuing violations. The summary judgment evidence shows that Jurach made multiple requests to change offices. Safety Vision granted all but her last request to move, although Jurach found many of the responses too slow, and ultimately found each move inadequate. When Jurach asked for an office transfer again in early October 2010, her supervisor told her that he would try to find her an acceptable space. (Jurach Affidavit at ¶ 39). None of Jurach's requests, except the request to have the library converted to a private office for her, were explicitly denied in the sort of "discrete and salient event that should put an employee on notice that a cause of action has accrued." *Huckabay*, 142 F.3d at 240. Given the nature of Jurach's requests, the responses, and the absence of an explicit denial of her final request to move, *Henson* does not bar Jurach's claims.

Safety Vision also argues that the evidence fails to support Jurach's failure-to-accommodate claim. (Docket Entry No. 15 at 18). The elements to support such a claim are "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (internal quotations omitted).

Safety Vision contends that it did not have to accommodate Jurach's disability because she did not provide a doctor's note stating that the accommodations she sought were medically necessary. (Docket Entry No. 15 at 18). Jurach responds that she gave Ondruch a doctor's note dated September 27, 2010. The note stated that Jurach had "great problems with being able to function near fluorescent lights," and concluded: "[i]f you can possibly accommodate her to a less lighted area, it would be very beneficial to her." (Docket Entry No. 20, Ex. A-10). The parties dispute whether Ondruch actually received this note.

Safety Vision argues that even if Ondruch received the note, it did not require Safety Vision to grant Jurach's requested accommodations. The note stated that a less lighted area would be "beneficial," not that it was "necessary." (Docket Entry No. 15 at 18). Safety Vision contends that under *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 225 (5th Cir. 2011), employers are only required to provide accommodations that are medically necessary, not merely medically beneficial. *Griffin*'s holding is not so broad. In *Griffin*, the plaintiff suffered from diabetes and asked to be taken off the night shift. *Id.* at 224–25. Griffin's doctors told his employer that he was not substantially limited because of his diabetes, but that a day shift rather than a night shift would put him "in a better position to follow his therapeutic diabetes regimen" of "refrain[ing] from eating fatty, sugary, or otherwise unhealthy foods." *Id.* at 222–23. Earlier doctors' notes "made no mention of a restriction on overnight hours." *Id.* at 224. The Fifth Circuit found that the doctors' notes Griffin provided did not require the employer to move Griffin to the day shift because the notes did not establish that the requested accommodation was necessary for Griffin to manage his disability. *Id.* at 225. The court noted that Griffin terminated the interactive process prematurely by voluntarily retiring without asking his employer to reconsider its decision not to change his shift.

*Id.* Jurach's doctor's note stated that her working conditions caused her pain and that it could be relieved by working in low light, alleviating a limit on her ability to work. The doctor's note did not merely state that a low-light working space would help Jurach follow a better therapeutic regime.

Jurach, however, was inconsistent about the accommodations she wanted. Even if Safety Vision received the doctor's note, the evidence shows that Safety Vision did repeatedly offer Jurach the accommodations she sought and her doctor recommended. The summary judgment evidence shows that Safety Vision made multiple attempts to accommodate Jurach's disability by allowing her to change offices repeatedly from 2008 to 2010.

The TCHRA and the ADA do not create a right to the employee's preferred accommodation, but to a "reasonable accommodation resulting from an 'interactive process' between the employer and the employee."[2] *Griffin*, 661 F.3d at 224. When an employee's disability and resulting limitations are not "open, obvious, and apparent to the employer," the employee bears the initial burden of requesting accommodation. *EEOC v. Chevron Phillips Chem. Co., L.P.*, 570 F.3d 606, 621 (5th Cir. 2009); *see also Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996). The initial burden is placed on the employee because "[i]t simply stands to reason that the employee and [her] health-care provider are best positioned to know what type of accommodation is appropriate for the employee." *Taylor*, 93 F.3d at 165. Once the employee makes such a request and identifies a reasonable accommodation, the employer must "engage in flexible, interactive discussions to determine the appropriate accommodation." *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009). An employer satisfies the requirement if it engages in the process in good faith, *Jakubowski*

---

[2] "Because the ADA and TCHRA are very similar, Texas courts and [the Fifth Circuit] focus on federal precedent regarding the ADA in interpreting the TCHRA." *Willi v. Am. Airlines, Inc.*, 288 F. App'x 126, 127 n. 2 (5th Cir. 2008) (citing *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006)).

*v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010), even if the employee rejects the reasonable accommodations that are offered. *See Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) ("an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer"); *Hagood v. Cnty. of El Paso*, 408 S.W.3d 515, 525–26 (Tex. App. — El Paso 2013, no pet.) ("Although an employee is not required to accept an offered accommodation, if he rejects a reasonable accommodation, the individual will no longer be considered a qualified individual with a disability.").

Jurach first complained to Safety Vision about her workspace in January 2006, telling the company that her small computer monitor caused her pain because of her disability. (Jurach Depo. at 143). Safety Vision gave Jurach a larger monitor. (*Id.* at 140–41). When Jurach returned to Safety Vision in November 2006 after an absence, she was given a cubicle by a window, providing her the natural light she wanted. She could face a wall and have no fluorescent lights in front of her or above her. But in late 2007, Jurach asked to be moved to a large interior office on another floor. (Jurach Affidavit at ¶ 14). Safety Vision accommodated this request. (*Id.*). Jurach was not satisfied with this accommodation because she shared the office with another employee who was not willing to turn off all of the lights. (*Id.*). In September 2008, Safety Vision again accommodated Jurach's request to move, this time to a private interior office where she could "turn all the lights out" and "disengage many of the [fluorescent] rods above." (*Id.* at ¶ 15). Jurach found this inadequate as well. Despite having a private office in a "less lighted area," consistent with the doctor's note and her own description of the accommodations she needed, Jurach still complained that the office did not relieve her pain. (*Id.* at ¶¶ 15–17). She asked in February and November of 2009 to be moved

to an office with a window and natural light. (*Id.* at ¶¶ 16–17). Safety Vision did not immediately accommodate this request, a delay she faults. Safety Vision did move her to the top floor in September 2010 as part of a reorganization, and gave her a cubicle near a window where there was more natural light. (*Id.* at ¶¶ 27–30). Jurach did not find this satisfactory. She asked to be moved to a library space that she wanted converted to a private office, which Safety Vision declined to do. Jurach's supervisor told her that he would try to find her a private interior office and offered an interior conference room downstairs in the interim, until another office opened. (*Id.* at ¶ 39). Jurach rejected this offer, preferring to work from home one full day and two half-days per week. (Jurach Depo. at 265–66). Safety Vision agreed. Jurach began working from home for part of each week at the end of September 2010. (Jurach Affidavit at ¶ 39). She continued to ask for a private office. Her last such request was on October 7, 2010, one week before she was laid off in the reduction in force. (Docket Entry No. 20, Ex. A-12).

The record is clear that Safety Vision engaged in an interactive process of trying to find an appropriate accommodation for Jurach and continued that process through the end of her employment. Jurach was given four different offices in response to her complaints. One of these offices was a private interior office. Another had a window and allowed her to face a wall, with no fluorescent lights in front of her or above her. She also rejected a September 2010 offer that would have allowed her to work in an interior conference room that would give her a private work space was held there, which rarely occurred. All of those arrangements were similar to the acceptable accommodations she lists in her affidavit. Despite receiving accommodations that she herself suggested would be appropriate, Jurach complained about all of the offices that were given to her. There is no factual dispute about Safety Vision's participation in an interactive process to find a

reasonable accommodation for Jurach. Summary judgment is granted on the failure-to-accommodate claim.

## B. Discriminatory Discharge

When a plaintiff presents indirect or circumstantial evidence of discrimination, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004); *see also Chevron Phillips*, 570 F.3d at 615 (citing *McInnis v. Alamo Comm. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000)). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid,* 376 F.3d at 312. To make such a showing, the plaintiff must show that "(a) she is disabled, has a record of having a disability, or is regarded as disabled, (b) she is qualified for her job, (c) she was subjected to an adverse employment action on account of her disability or the perception of her disability, and (d) she was replaced by or treated less favorably than non-disabled employees." *Chevron Phillips*, 570 F.3d at 615 (citing *McInnis*, 207 F.3d at 279); *see also Cardiel v. Apache Corp.*, 559 Fed. App'x 284, 288 (5th Cir. 2014) (unpublished); *Lee v. Kansas City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009). In a reduction-in-force case, a plaintiff can satisfy the fourth element by showing "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003).

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of*

*Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Chevron Phillips*, 570 F.3d at 615 n.6. The plaintiff must then identify or offer evidence to create a factual dispute "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

In a pretext case, the plaintiff must point to disputed facts supporting a finding that the defendant's proffered reason was not the true reason for the challenged action. *Rachid*, 376 F.3d at 312. In a mixed-motive case, if the plaintiff shows that illegal discrimination was a motivating factor in the challenged action, the defendant may respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Id.*

The plaintiff has the ultimate burden of showing a genuine dispute of material fact as to whether the defendant discriminated against her on the basis of her disability. *See Reeves*, 530 U.S. at 143. The question on summary judgment is whether there is a conflict in substantial evidence to create a jury question of disability discrimination. *See Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503 (5th Cir. 2003).

For the purposes of its summary judgment motion, Safety Vision does not dispute that Jurach is disabled under the TCHRA and the ADA, that she was qualified for her job, and that she suffered an adverse employment decision when she was laid off. Safety Vision does dispute that the

circumstances of Jurach's termination give rise to an inference that the decision was causally linked to her disability. Alternatively, Safety Vision argues that it has shown legitimate nondiscriminatory reasons for Jurach's termination and that, as a matter of law, there is no basis to find a factual dispute on pretext.

Jurach argues that she "need only point to the last seven months of her employment when Safety Vision never addressed her desperate requests for accommodation, holding out the promise of resolution, but snatching that hope from her with termination." (Docket Entry No. 19 at 24). She contends that "[a] reasonable jury could find that Safety Vision was motivated to place Jurach on layoff list because otherwise it would have to accommodate her disability." (*Id.*). As discussed above, uncontroverted evidence shows Safety Vision's participation in identifying and proposing reasonable accommodations for Jurach. The fact that these efforts proved unsatisfactory for different reasons does not preclude summary judgment based on undisputed evidence showing Safety Vision's repeated efforts to meet Jurach's requests.

Even if Jurach could make a *prima facie* showing on this record, she has neither submitted nor pointed to evidence raising a factual dispute over Safety Vision's proffered legitimate nondiscriminatory reasons for laying her off. Jurach instead asserts that she does not need to address pretext. She relies on an unpublished opinion in *Mathis v. BDO USA, LLP*, No. 4:13-CV-134, 2014 WL 975706, at *4 n. 1 (S.D. Tex. Mar. 12, 2014), in which the court observed in a footnote that "it appears impossible to state this sort of *prima facie* case and not defeat summary judgment altogether." The Fifth Circuit has not adopted this reasoning. *See Tyler v. La-Z-Boy Corp.*, 506 F. App'x 265, 270 (5th Cir. 2013) (unpublished) (finding that the plaintiff might make a *prima facie* showing, but affirming the district court's grant of summary judgment because the plaintiff had not

raised a factual dispute on pretext in response to the employer's legitimate nondiscriminatory reason for the adverse employment action); *Palasota*, 342 F.3d at 578 (engaging in a pretext analysis after finding a *prima facie* case and finding a factual dispute). Because Jurach has identified no evidence that would support an inference that she was laid off because of her disability or create a factual dispute as to pretext, summary judgment is granted on this claim.

### C.      The Retaliation Claim

An employer violates the TCHRA by retaliating against a person who: "(1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE § 21.055.

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims. *See Mota v. Univ. of Texas Houston Health Science Center*, 261 F.3d 512, 519–20 (5th Cir. 2001); *McDonnell Douglas*, 411 U.S. at 802. The employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the employment action. The burden then shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Mota*, 261 F.3d at 519–20.

The elements of a *prima facie* showing of retaliation are that: (1) the plaintiff engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *See Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). It is undisputed that Jurach's layoff was an adverse employment action and that she engaged in a protected activity by complaining that she

was not receiving necessary accommodations for her disability. Safety Vision argues that Jurach cannot make a *prima facie* showing of retaliation because there was no causal link between her requests for accommodation and her termination.

The causal link required for a *prima facie* showing of retaliation is established if evidence shows "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001). A plaintiff alleging retaliation may satisfy the causal connection element by showing "[c]lose timing between an employee's protected activity and an adverse action against him." *McCoy*, 492 F.3d at 562. The Supreme Court has noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001). The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link. *See*, *e.g.*, *Feist*, 730 F.3d at 455 ("This Court has found, for example, that a time lapse of up to four months may be sufficiently close, while a five month lapse is not close enough without other evidence of retaliation.") (internal quotations omitted); *Stroud v. BMC Software*, *Inc.*, No. 07-20779, 2008 WL 2325639, at *6 (5th Cir. Jun. 6, 2008) (finding that a 3-week lapse between protected activity and adverse employment action was sufficient to show a causal link); *Richard v. Cingular Wireless LLC*, 233 Fed. App'x 334, 338 (5th Cir. 2007) (concluding that 2.5 months is short enough to support an inference of a causal link); *Bell v. Bank of Am.*, 171 Fed. App'x 442, 444 (5th Cir. 2006) (holding that a seven-month period does not support a causal link); *Jones v. Robinson Property Group*, *L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding that less than 60 days supported a *prima facie* showing of retaliation); *Ware v. CLECO Power LLC*, 90 Fed. App'x 705, 708 (5th Cir. 2004) (finding a

15-day period sufficient to support an inference of causation); *Harvey v. Stringer*, 113 Fed. App'x 629, 631 (5th Cir. 2004) (finding that a 10-month period did not show a causal link); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002) (holding that a five-month period does not support an inference of a causal link); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (finding that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes" (internal citations omitted)).

Jurach argues that there is a causal link because she was laid off in October 2010, one month after she talked to the President and the CFO of Safety Vision about her need for accommodation. Although Jurach told Smith and Ondruch about her accommodation requests shortly before she was laid off, the summary judgment evidence shows that they were aware of her requests for accommodation long before that. Jurach testified that she told Smith in January 2010 that she would need time off to have surgery for her eye problems. (Jurach Affidavit at ¶ 18). Ondruch testified that he became aware of Jurach's condition in February 2010, when she asked to work from home during her recovery from eye surgery because of her vision problems. (Ondruch Depo. at 85). A 10-month gap between protected activity and job termination is too long to suggest causation. *See Harvey*, 113 Fed. App'x at 631 (finding that a 10-month period did not create a causal link). That is particularly true when, as here, the employer did not use earlier opportunities for employment termination. Jurach was not laid off until the final stage of the reduction in force.

Even if Jurach made a *prima facie* showing of retaliation, the record does not raise material factual disputes. Safety Vision presented evidence that financial difficulties made a reduction in force necessary and that it planned to attend fewer trade shows as a result of these difficulties. It also stated that Jurach was paid more than Foteh, who absorbed Jurach's trade show duties after she

was laid off, and that Jurach's Trade Show Coordinator role was not a stand-alone position before 2007.

Jurach must raise a factual dispute about whether the adverse employment action would have occurred but for her protected conduct. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —U.S.—, 133 S. Ct. 2517, 2533 (2013); *Feist*, 730 F.3d at 454. She can do so "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination," *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005), or by demonstrating that the proffered reasons are false or "unworthy of credence." *Bourgeois v. Mississippi Valley State Univ.*, 507 F. App'x 386, 388 (5th Cir.) *cert. denied*, 134 S. Ct. 163 (2013) (quoting *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011)); *see also Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002) (an employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual).

Jurach argues that Safety Vision's reasons were pretextual because they should "have realized that Jurach was irreplaceable with regard to coordinating trade shows." She argues that, contrary to its assertions in this lawsuit, Safety Vision was in "good financial shape" in 2010 because: the Vice President of sales "boast[ed] on how well the company did in 2009, despite the economy"; the Business Development Manager "had several large deals in the pipeline" and incurred significant travel expenses promoting Safety Vision; Safety Vision did not reduce the number of trade shows it attended after it fired Jurach; and Safety Vision purchased another company, I-COP, five months after the final round of layoffs. (Docket Entry No. 19 at 36).

Safety Vision has presented undisputed evidence that in August 2010, it was significantly below its revenue budget for the year. Its financial condition continued to decline through October 2010, resulting in the decision to implement the reduction in force. (Ondruch Depo. at 45–46, 65–66; Docket Entry No. 15, Exs. E, Dilber Depo. at 194–95). A reduction in force is a legitimate nondiscriminatory reason to terminate employees. *Pryor v. MD Anderson Cancer Ctr.*, 495 F. App'x 544, 547 (5th Cir. 2012). An employee cannot show pretext merely by questioning the company's business judgment that such a reduction was necessary. *See Villareal v. Texas A&M Sys.*, 561 Fed. App'x 355, 359 (5th Cir. 2014); *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996). Safety Vision presented evidence that it did, in fact, reduce the number of trade shows it attended and that it intended to reduce its trade show presence when it laid Jurach off. (Dilber Depo. at 83–84; 225–27). Safety Vision's purchase of I-COP five months after completing the reduction in force does not show that the layoffs were a pretext for firing Jurach because of her disability. *See Hanchey v. Energas Co.*, 925 F.2d 96, 98 (5th Cir. 1990) (the fact that the employer purchased another company nine months after the plaintiff was terminated did not show that the reduction in force was a pretext for discrimination).

In her deposition, Jurach acknowledged that Safety Vision "needed to cut back some unnecessary positions due to the economy." (Jurach Depo. at 277–78). She believed that her position should not have been among those cut. This disagreement with Safety Vision's business decision does not show pretext. Jurach offers neither offers nor identifies evidence that retaliation for her accommodation requests contributed to Safety Vision's decision to include her in the last and final stage of the reduction in force. To the contrary, as discussed above, the undisputed summary judgment evidence shows that Safety Vision accommodated Jurach's requests to be moved to a new

office multiple times and that it continued to engage in an interactive process with Jurach up until her termination.

Finally, Jurach claims that Safety Vision's reason for including her in the reduction in force was pretextual because Ondruch and Smith "showed cold resentment when she told them she needed a second surgery to save her sight" in January 2010. (Docket Entry No. 19 at 34). Jurach stated in her affidavit that Smith asked "[w]ell . . . who is going to do your job?" when she told him she needed an extended medical leave for the surgery. (Jurach Affidavit at ¶ 18). She also said that Smith had not called, emailed, or sent her a get-well card after her cancer surgeries in 2008. (*Id.*).

These actions and comments were not made close to when Jurach was laid off and did not relate to the decision to include her in the reduction in force. *See CSC Logic*, 82 F.3d at 655–56 (in analyzing whether a remark is probative of discriminatory intent, a court examines whether the comment is related to the protected class of persons of which the plaintiff is a member, proximate in time to the termination, made by an individual with authority over the employment decision at issue, and related to the employment decision at issue). Even assuming that asking "who is going to do your job" reflects a reluctance to grant medical leave, the fact that this remark was 10 months before the decision to include Jurach in the reduction in force supports summary judgment.

Jurach has not raised a factual dispute or pointed to evidence that would allow a jury to conclude that Safety Vision's articulated reasons for including her in the reduction in force were false or pretextual. Summary judgment is granted on her retaliation claim.

## C.    The ERISA Claim

Jurach claims that Safety Vision fired her to interfere with her use of medical benefits under the group healthcare plan and to retaliate against her for using those benefits, in violation of § 510

of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Safety Vision argues that these claims are time-barred. ERISA does not provide a statute of limitations for § 510 claims. *Muldoon v. C.J. Muldoon & Sons*, 278 F.3d 31, 32 (1st Cir. 2002); *see also McClure v. Zoecon, Inc.,* 936 F.2d 777, 778 (5th Cir. 1991). A court looks to Texas state law for the most analogous state-law limitations period. Section 510 "proscribes specified acts of 'discharge' and 'discrimination,'" and the analogous state statute of limitations applies. *McClure,* 936 F.3d at 778. The Fifth Circuit has held that "Texas's two-year statute of limitations for wrongful discharge and discrimination applies to section 510." *Lopez ex rel. Gutierrez,* 389 F.3d at 507 (citing *McClure,* 936 F.2d at 778–79).

Jurach's claims arise from her termination on October 14, 2010. She asserted ERISA claims for the first time in January 2014, more than two years later. (Docket Entry No. 7, Ex. 4). She argues that her ERISA claims relate back to her prior claims, which arise from the same events. To relate back, a claim must have arisen out of the same "conduct, transaction, or occurrence set forth" in the original complaint. FED. R. CIV. P. 15(c)(2). "When new or distinct conduct, transactions, or occurrences are alleged as grounds for recovery, there is no relation back." *Holmes v. Greyhound Lines, Inc.,* 757 F.2d 1563, 1566 (5th Cir. 1985). Jurach's ERISA claims arise from the same occurrences as her other claims. They are not time-barred, but they fail on the merits.

ERISA claims are examined under the *McDonnell Douglas* burden-shifting framework. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1993) (citation omitted); *see Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 761 (5th Cir. 1996); *Hines v. Massachusetts Mutual Life Ins. Co.*, 43 F.3d 207, 209 (5th Cir. 1995). To make a *prima facie* showing of interference under § 510, an employee must show "(1) prohibited (adverse) employer action (2) taken for the purpose of

interfering with the attainment of (3) any right to which the employee is entitled" or may become entitled. *Bodine v. Employers Cas. Co.*, 352 F.3d 245, 250 & n. 3 (5th Cir. 2003). "An essential element of a Section 510 claim is proof of defendant's specific discriminatory intent." *Hines*, 43 F.3d at 209. If the plaintiff makes a *prima facie* showing, a presumption of discrimination is created, and the defendant must articulate a legitimate nondiscriminatory reason for its conduct. *Clark*, 990 F.2d at 1223. If the defendant provides an acceptable reason for its conduct, the presumption of discrimination disappears, and the plaintiff must demonstrate that the reason given was a pretext for discrimination. *Id.*

When there are legitimate nondiscriminatory reasons for the plaintiff's termination, there is no "specific discriminatory intent" to interfere with the employee's rights under a group healthcare plan. *See Rodriguez v. Mrs. Baird's Bakery*, 111 F.3d 893 (5th Cir. 1997). The "incidental loss of benefits due to discharge" is insufficient to show intent. *Id.* "The plaintiff need not prove that the discriminatory reason was the only reason for discharge, but [s]he must show that the loss of benefits was more than an incidental loss from [her] discharge." *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 260 (5th Cir. 2001).

To show discriminatory intent, Jurach points to Ondruch's statement that Safety Vision's health care costs were a "concerning expense," and to the fact that Safety Vision paid for Charles Garrett, a disabled employee, to keep his COBRA benefits from his previous employer rather than placing him on Safety Vision's health insurance program. (Docket Entry No. 19 at 40). An employer's stated intent to "cut costs" does not provide evidence of discriminatory intent. *See Unida v. Levi Strauss & Co.*, 986 F.2d 970, 980 (5th Cir. 1993). Garrett's situation does not show that Safety Vision intended to interfere with its employees' rights to healthcare under the group

policy. Garrett testified in his deposition that keeping his COBRA benefits was preferable to being on Safety Vision's plan because its health insurance was more expensive and had fewer relationships with healthcare providers in the area where he lived. (Garrett Depo. at 115, 185). When Garrett's COBRA benefits expired in mid-2010, he was placed on Safety Vision's health insurance. His employment was terminated in October 2010. Unlike Garrett, Jurach was on Safety Vision's healthcare throughout her employment, and there is no evidence that Safety Vision specifically intended to interfere with her enjoyment of healthcare benefits. Even if Jurach succeeded in making a *prima facie* showing of interference, she has not raised a factual dispute in response to Safety Vision's proffered reasons for including her in the reduction in force.

Jurach also argues that there is evidence that Safety Vision fired her in retaliation for using her healthcare benefits because the Director of Human Resources told her in 2009 that Safety Vision knew she was responsible for $90,000 in claims for cancer treatments she received in 2008. (Jurach Affidavit at ¶ 45). The elements of a *prima facie* showing of retaliation in violation of § 510 are that "(1) [the plaintiff] was engaged in activity that ERISA protects; (2) she suffered an adverse employment action; and (3) a causal link exists between [her] protected activity and the employer's adverse action." *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 628 (6th Cir. 2008); *accord Curby v. Solutia, Inc.*, 351 F.3d 868, 871 (8th Cir. 2003). Jurach's 2008 use of her healthcare benefits was a protected activity, and Jurach's termination in 2010 was an adverse employment action. But there is no evidence of any causal relationship. The two-year gap between the health expenses and the layoff weighs against any such inference. Jurach has pointed to no other evidence that her 2008 healthcare spending, rather than the reduction in force, caused her 2010

termination. *See Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001). Jurach has not made a *prima facie* showing of unlawful retaliation under ERISA.

Summary judgment is granted on Jurach's ERISA claims.

## IV.    Conclusion

Safety Vision's motion for summary judgment is granted. Final judgment is entered by separate order.

SIGNED on December 12, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge